**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COLUMBUS PRESSLEY,                    :
                                      :
        Plaintiff,                    :    Civil Action No.:    22-02262 (RC)
                                      :
        v.                            :    Re Document Nos.:    53, 55, 57, 58
                                      :
MANAGEMENT SUPPORT                    :
TECHNOLOGY, INC.,                     :
                                      :
        Defendant.                    :

**<u>MEMORANDUM OPINION</u>**

**Denying Plaintiff's Partial Motion for Summary Judgment; Granting
Defendant's Cross-Motion for Summary Judgment; Granting Defendant's
Motions for Leave to File Exhibits under Seal**

## I.  INTRODUCTION

Plaintiff Columbus Pressley ("Mr. Pressley") brings this discrimination suit to challenge

the employment decisions of his former employer, Defendant Management Support Technology,

Inc. ("MSTI").  Mr. Pressley asserts that MSTI penalized him for disability-related tardiness and

terminated him after he requested intermittent medical leave. Such actions, Mr. Pressley

contends, violated his rights under the Americans with Disabilities Act ("ADA"), the District of

Columbia Human Rights Act ("DCHRA"), the Family Medical Leave Act ("FMLA"), and the

District of Columbia Family and Medical Leave Act ("DCFMLA"). Currently before the Court

are the parties' cross-motions for summary judgment. Upon careful consideration of the parties'

papers, the proffered evidence, and the applicable legal standards, the Court denies Mr.

Pressley's motion for summary judgment and grants MSTI's cross-motion. Mr. Pressley has not

met his burden of showing that a reasonable jury could conclude that he suffered discrimination

or retaliation. Rather, the evidence overwhelmingly indicates that MSTI disciplined Mr. Pressley

due to his inability to perform an essential function of his employment and ultimately terminated him because it believed Mr. Pressley violated security policies.

## II.  BACKGROUND

### A.  Factual Background[1]

#### 1.  MSTI Hires Mr. Pressley

MSTI, a contractor, provides asset management services to government agencies, including the Federal Trade Commission ("FTC"). In October 2018, MSTI hired Mr. Pressley in the position of Material Coordinator for IT Asset Management and assigned him to its FTC contract. Pl.'s Statement of Facts ("Pl.'s Stmt.") ¶ 3, ECF 53-1; Def's Statement of Facts ("Def.'s Stmt.") ¶ 1, ECF No. 54-1. Mr. Pressley was required to handle the IT asset management supply chain for the FTC, including ordering equipment, deploying it, and managing its movement between offices. Def.'s Stmt. ¶ 2. In this role, Mr. Pressley worked in the FTC's headquarters in Washington, D.C. Def.'s Opp'n to Pl.'s Partial Mot. Summ. J. ("Def.'s Opp'n"), ECF No. 54, Ex. 10. Mr. Pressley's position required reliable, on-site staffing during business hours to ensure continuous IT support for the FTC. *Id*. According to MSTI, attendance issues "have a direct negative impact on [MSTI's] ability to provide the necessary services" to the FTC. *See e.g.*, Pl.'s Partial Mot. Summ. J. ("Pl.'s MSJ"), ECF No. 53, Ex. 5 at 3;

---

[1] "[T]he Court [will] assume that facts identified by the moving party in its statement of material facts are admitted" if the opposing party does not controvert such a fact "in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1). The Court notes that Mr. Pressley's opposition to MSTI's cross-motion for summary judgment did not include a "statement of genuine issues" controverting any facts in MSTI's statement of material facts, as required by the local rules. *See* LCvR 7(h)(1). Thus, to the extent that Mr. Pressley "fails to properly . . . address [MSTI]'s assertion of fact" due to his failure to file a statement of genuine issues, "the [C]ourt [will] . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e), (e)(3).

Def.'s Stmt. ¶ 6. Mr. Pressley's work hours were from 8:30 a.m. to 5:30 p.m. Def.'s Cross-Mot.

Summ. J. ("Def.'s MSJ"), ECF No. 58, Ex. 16. Mr. Pressley initially reported to MSTI Project

Manager Leslie Alexander. *See* Pl.'s Stmt.  ¶ 8; Pl.'s MSJ, Ex. 4 at 3. After May 2019, Mr.

Pressley reported to Project Manager Veronica Matthews. Pl.'s Stmt. ¶ 8; Pl.'s MSJ, Ex. 4 at 3.

Prior to his hire, Mr. Pressley informed MSTI that he had a purported disability. Pl.'s

MSJ, Ex. 1. Shortly after MSTI hired him, in November 2018, Mr. Pressley requested that MSTI

accommodate this purported disability. *Id.* Ex. 2. In support of his accommodation request, Mr.

Pressley provided MSTI with a four-year-old doctor's note from 2014, which indicated that Mr.

Pressley had sleep apnea at that time. Def.'s MSJ, Ex. 5 at 4. Upon receipt of Mr. Pressley's

accommodation request, MSTI asked Mr. Pressley to provide updated medical documentation

attesting to his need for accommodation. *Id.* Ex. 6 at 1.

### 2.  Mr. Pressley's Tardiness and Schedule Adjustments

Within a few months of Mr. Pressley's hire, in March 2019, MSTI evaluated Mr.

Pressley's performance and noted that "[it] would like to see [him] improve on [his]

punctuality." Pl.'s MSJ, Ex. 3. From May 2019 to July 2019, Mr. Pressley arrived tardy to work

at least six times, despite MSTI counseling Mr. Pressley on its "expectations of his arrival for his

shift" and informing him that "continued late arriv[als] [could] result in further disciplinary

action." *Id.* Ex. 5 at 1. On July 10, 2019, MSTI suspended Mr. Pressley without pay for two days

because of his continued failure to report to work by 8:30 a.m. *Id.* at 2. The Letter of Suspension

noted that, when MSTI questioned Mr. Pressley about his late arrivals, he stated, "I'm working

on getting documentation from my physician." *Id.* at 1. From August 2019 to September 2019,

Mr. Pressley arrived tardy to work at least three times. *Id.* Ex. 6 at 1. As a result, MSTI

suspended him without pay for five days on September 21, 2019.  *Id.*

Shortly thereafter, on October 7, 2019, Mr. Pressley sought MSTI's approval to attend a professional development event. MSTI denied the request "based on [Mr. Pressley's] standing with MSTI." *Id*. Ex. 7.

On October 23, 2019, Mr. Pressley requested intermittent FMLA medical leave and provided MSTI with a certification from his doctor. *Id*. Ex. 8; Def.'s MSJ, Ex. 8 at 1. On November 12, 2019, MSTI adjusted Mr. Pressley's work schedule to 9:30 a.m. to 5:30 p.m., permitting him to start an hour later than his original 8:30 a.m. start time. Def.'s Opp'n, Ex. 14. MSTI made the schedule change "based on [Mr. Pressley's] request" and to eliminate late arrivals.  Def.'s Stmt. ¶ 13; Def.'s MSJ, Ex. 7. On November 22, 2019, MSTI formally approved Mr. Pressley's intermittent FMLA medical leave, which would run concurrently with DCFMLA leave. Def.'s Opp'n, Ex. 15 at 2. And MSTI again adjusted Mr. Pressley's work schedule, permitting him to start work at 10:00 a.m., an hour-and-a-half later than his original 8:30 a.m. start time. *Id*. Despite these schedule adjustments, Mr. Pressley was still tardy to work, arriving as late as 10:46 a.m. on one occasion. Def.'s Stmt. ¶ 14; Pl.'s MSJ, Ex. 13.

### 3.  Mr. Pressley's Performance Issues

On December 11, 2019, FTC personnel emailed MSTI "to formally convey the need to address the unsatisfactory performance of Asset Management Coordinator Mr. Columbus Pressley." Def.'s Opp'n, Ex. 7. In the email, the FTC explained that "Mr. Pressley appears to be complicating the issues and preventing the efficient assignment and completion of tasks." *Id*. According to the FTC, Mr. Pressley's complication and inefficiency occurred on at least two occasions, in October 2019 and November 2019.  *Id*. The FTC noted that on one of these occasions, "[i]nstead of simply following [MSTI's] guidance, Mr. Pressley sought to complicate the task, which was properly addressed" by another individual. *Id*. And "[d]ue to the number of

essential support functions MSTI supports, time must be applied to critical tasks" instead of "the increasing amount of oversight for one person." *Id*. The FTC urged MSTI to "address this issue in a timely manner." *Id*. Upon receiving the FTC's email, MSTI noted internally that the FTC had "documented several instances of [Mr. Pressley's] poor performance which ha[d] placed [its] contract at risk" and contemplated "remov[ing] Mr. Pressley from the contract utilizing the at will employment clause." *Id*.

### 4.  Mr. Pressley's Security Violation and Termination

Shortly thereafter, on December 13, 2019, FTC personnel discovered that Mr. Pressley had been entering and exiting the FTC headquarters after his core hours of 10:00 a.m. to 5:30 p.m., observing that "there are several departures and entries beyond 7:00 [p.m.] with the latest time being after 10 [p.m.] at night." Pl.'s MSJ, Ex. 17 at 2. FTC security logs indicated that from at least October 1, 2019 to December 11, 2019, Mr. Pressley almost never left the worksite at any time shortly after 5:30 p.m., when his shift ended. *See* Def.'s MSJ, Exs. 12, 14. After making this discovery, FTC personnel alerted MSTI that it was "very disturbed" by Mr. Pressley's "inconsistent entry and exiting [from] the FTC HQ building." *Id*. Ex. 4 at 3. The FTC explained to MSTI that "Mr. Pressley works in an accountable area and such behavior does not match the suitable performance that trusted personnel should conduct." *Id*.

That same day, the FTC met with MSTI to discuss its "concerns regarding the need for [Mr. Pressley's] onsite presence without supervision or approval," due to "the area of responsibility [to which] Mr. Pressley [was] assigned." *Id*. at 1. And according to MSTI, it was "not aware of the need for nor [had it] authorized these off hour occurrences." *Id*. The FTC then initiated an immediate audit of its assets and discovered that "Mr. Pressley's laptop and cellular device were not located onsite." *Id*. The FTC then informed MSTI that Mr. Pressley had until

12:00 p.m. that day to return all assets to FTC's headquarters, otherwise, Federal Protective Services would retrieve the assets. *Id*; *see also* Pl's MSJ, Ex. 25. The FTC deactivated all of Mr. Pressley's accounts that same morning. *See* Def.'s MSJ, Exs. 12, 14.

By approximately 1:30 p.m., MSTI terminated Mr. Pressley, citing his violation of "[FTC] security regulations and protocols for contract employees." Pl.'s MSJ, Exs. 15, 16. Mr. Pressley's termination occurred 21 days after MSTI approved his intermittent medical leave request. Pl.'s Stmt. ¶ 24.

MSTI's Policies Handbook, which Mr. Pressley attested to reading and understanding, Def.'s MSJ, Ex. 3, required Mr. Pressley to "leave the customer's premise after [he] complete[d] [his] work hours" and "not loiter at the customer's site," *Id*. Exs. 3, 14 at 2. The Handbook also prohibited Mr. Pressley from removing customer property from the customer's premises without supervisor authorization. *Id*. Ex. 14 at 3. Moreover, the contract between the FTC and MSTI authorized the FTC to deny and/or restrict access to government facilities, controlled unclassified information, and/or IT resources for any contract employee who the FTC determined to present a risk of compromising confidential unclassified information.  Def.'s Opp'n, Ex. 9.

### 5.  Prior Security Violations by MSTI

In 2019, the FTC experienced a separate security breach involving different MSTI personnel. Contracted consultant Alex Barnwell and Project Manager Mr. Alexander violated FTC's security policy when Mr. Alexander "[allowed] Mr. Barnwell access to [FTC] . . . space without authorized MSTI or FTC personnel present" and directed FTC staff "to log-in to the FTC reporting program to allow Mr. Barnwell to work." Pl.'s MSJ, Ex. 20 at 1. Before this incident, Mr. Barnwell had been employed at MSTI from August 2016 to January 2018, when he

left voluntarily to pursue a different employment opportunity. *Id.* Ex. 19 at 1. Thereafter, MSTI

contracted Mr. Barnwell as a consultant from January 2018 to February 2019. *Id.*

### B.  Procedural Background

On May 14, 2025, Mr. Pressley moved for partial summary judgment as to liability,

seeking for this Court to declare that MSTI is liable as a matter of law for his injuries and leaving

the issue of his damages to be determined at a later date. *See generally* Pl.'s MSJ. In his motion,

Mr. Pressley brings several state and federal employment discrimination claims challenging

MSTI's employment decisions:

a)  Failure to provide reasonable accommodations in violation of the ADA (42 U.S.C.

§ 12101 *et seq.*) and DCHRA (D.C. Code § 2-1402.01 *et seq.*);

b)  Discrimination in violation of the ADA and DCHRA;

c)  Retaliation for engaging in protected activities in violation of the ADA, FMLA (29

U.S.C. § 2601 *et seq.*), and DCFMLA (D.C. Code § 32-501 *et seq.*); and

d)  Interference with the exercise of his rights under the FMLA and DCFMLA.

MSTI opposed Mr. Pressley's motion and cross-moved for summary judgment.[2] Def.'s

Opp'n; Def.'s MSJ. Mr. Pressley opposed MSTI's motion but did not attach a "statement of

genuine issues" as required by the local rules. *See supra* p. 2 n.1. And both parties filed replies in

support of their own motions. Pl.'s Reply Supp. Mot. Summ. J. ("Pl.'s Reply"), ECF No. 59;

Def.'s Reply Supp. Mot. Summ. J. ("Def.'s Reply"), ECF No. 61. The parties' cross-motions for

summary judgment are now ripe for the Court's consideration.

---

[2] Pursuant to the parties' stipulated protective order, ECF No. 50, MSTI seeks leave to file under seal exhibits in support of its opposition and summary judgment motion, ECF Nos. 55, 57. The Court grants such leave.

### III.  LEGAL STANDARD

When parties file cross-motions for summary judgment, each motion is viewed separately, in the light most favorable to the non-moving party, with the court determining, for each side, whether the summary judgment standard has been met. Fed. R. Civ. P. 56; *Ateba v. Jean-Pierre*, 706 F. Supp. 3d 63, 74 (D.D.C. 2023), *aff'd sub nom., Ateba v. Leavitt*, 133 F.4th 114 (D.C. Cir. 2025). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Each party must carry its own burden of proof. *United States Dept. of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989). The mere existence of some factual dispute, however, is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986). Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. at 248.

To establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp*., 564 F.3d 462, 465–66 (D.C. Cir. 2009). Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

The district court may not make credibility determinations or weigh the evidence. *Liberty Lobby*, 477 U.S. at 255. The district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one sided that one party must prevail as a matter of law." *Id*. at 251–52. In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249– 50 (citation modified).

## IV.  ANALYSIS

Mr. Pressley brings a variety of employment discrimination claims under the ADA, DCHRA, FMLA, and DCFMLA. He contends that MSTI discriminated and retaliated against him and interfered with the exercise of his rights. Opposing these claims, MSTI asserts non-discriminatory explanations for its employment decisions and sets forth evidence in support thereof. The Court's review of the undisputed evidence reveals that such evidence "is so one-sided that" MSTI "must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251.

The evidence overwhelmingly shows that Mr. Pressley was unable to perform an essential function of his employment—arriving to work on time—despite MSTI adjusting his work schedule, an accommodation Mr. Pressley requested for his purported disability. The evidence further shows that MSTI disciplined Mr. Pressley because of these performance issues, not because he was disabled or requested accommodations. Moreover, the evidence indicates that MSTI terminated Mr. Pressley because it believed that he committed security violations, as corroborated by the FTC's revocation of Mr. Pressley's security privileges after it discovered his unauthorized, after-hours access to the FTC premises. Finally, no evidence supports Mr.

Pressley's contention that MSTI unfairly delayed approving Mr. Pressley's medical leave request.

Thus, Mr. Pressley has not met "his burden of showing that a reasonable jury could conclude that he had suffered" discrimination, retaliation, or interference. *Aka v. Washington Hosp. Center*, 156 F.3d 1284, 1290 (D.C. Cir. 1998). Accordingly, the Court denies Mr. Pressley's motion for summary judgment. Because "summary judgment should be granted where the evidence is such that it 'would require a directed verdict for the moving party,'" the Court grants MSTI's cross-motion for summary judgment. *Liberty Lobby*, 477 U.S. at 251 (quoting *Sartor v. Arkansas Gas Corp*., 321 U.S. 620, 624 (1944)).  Below, the Court analyzes each of Mr. Pressley's claims in turn.

### A. ADA and DCHRA Failure-to-accommodate and Disability Discrimination Claims

Mr. Pressley claims that MSTI failed to provide him with reasonable accommodations for his disability, a sleep disorder, and discriminated against him because of that disability. The ADA requires employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," and makes it unlawful to "discriminate against a qualified individual on the basis of disability." 42 U.S.C. §§ 12112(a), (b)(5)(A). Both claims require Mr. Pressley to show that he was a "qualified individual" within the meaning of the ADA—that is, that he could perform the essential duties of his job with (or without) reasonable accommodations. *See* 42 U.S.C § 12111(8). But the evidence here reflects that Mr. Pressley was unable to perform the essential duties of his job, even when MSTI ultimately granted him the accommodation that he initially sought. Mr. Pressley has therefore failed to establish the statutory requirement that he is a "qualified individual" under the ADA.

Employment discrimination claims asserted under District of Columbia law are analyzed identically to claims under federal law.[3] To prevail on his failure-to-accommodate claim under the ADA, Mr. Pressley must establish that (1) he was a "qualified individual" with a disability, (2) MSTI had notice of his disability, and (3) MSTI denied his request for a reasonable accommodation. *See Waggel*, 957 F.3d at 1371 (citing *Ward v. McDonald*, 762 F.3d 24, 31 (D.C. Cir. 2014)). Similarly, to sustain a claim under the ADA for discrimination, Mr. Pressley must prove that (a) he was a "qualified individual" with a disability and that (b) he suffered an adverse employment action because of his disability. *See Swanks v. Washington Metro. Area Transit Auth.*, 179 F.3d 929, 934 (D.C. Cir. 1999).

A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C § 12111(8); *Breen v. Dep't of Transp.,* 282 F.3d 839, 841 (D.C. Cir. 2002). Thus, an individual who is incapable of performing the essential functions of the employment position is not a "qualified individual" under the ADA. *See Baron v. Dulinski*, 928 F. Supp. 2d 38, 42 (D.D.C.2013); *Badwal*, 139 F. Supp. 3d at 310. Therefore, for Mr. Pressley to succeed on both claims, he must establish that he was able to perform the essential functions of his job with or without reasonable accommodations.

---

[3] No "material difference" exists between the ADA and the DCHRA, nor between the FMLA and DCFMLA. *Waggel v. George Washington Univ.*, 957 F.3d 1364, 1371 n.1 (D.C. Cir. 2020). Thus, when analyzing employment discrimination claims under both legal frameworks, the Court "treat[s] the analyses as identical" for purposes of the parties' motions. *Id*. Therefore, the Court considers all of Mr. Pressley's DCHRA and DCFMLA claims under the applicable federal standard. *See Badwal v. Bd. of Trs. of Univ. of D.C.*, 139 F. Supp. 3d 295, 308 (D.D.C. 2015).

Mr. Pressley, however, fails to address the elephant in the room: the record reflects that once MSTI permitted Mr. Pressley to start his workday at a later time—an accommodation Mr. Pressley requested for his purported disability—he was still, nonetheless, unable to consistently arrive on time for his shift.[4] Mr. Pressley himself acknowledges this. *See* Def.'s Opp'n, Ex. 4 at 47:17 ("Q: 'So even after you were given this later work time to accommodate your disability, weren't you still late even after that?' A: 'Yes.'").

Setting aside Mr. Pressley's contention that MSTI acted in bad faith during the interactive process, and regardless of whether his schedule modifications were provided under the ADA or the FMLA, the record shows that MSTI ultimately did allow Mr. Pressley to start work later. Def.'s MSJ, Ex. 7. When MSTI first hired Mr. Pressley, his scheduled work hours were 8:30 a.m. to 5:30 p.m. Def.'s Opp'n, Ex. 4 at 72:1–2. He later requested a "flexible work schedule" that would permit him to start an hour later. Pl.'s MSJ, Ex. 2. After MSTI adjusted his start time to 9:30 a.m., Mr. Pressley still struggled to arrive by that time. *See* Def.'s Opp'n, Ex. 6. He then asked MSTI to push his start time to even later. *See* Def.'s MSJ, Ex. 8. MSTI again approved his request and changed his start time to 10:00 a.m. *Id.* Nevertheless, Mr. Pressley continued to arrive tardy even with this later schedule, arriving as late as 10:46 a.m. on one occasion. *See* Def.'s Opp'n, Exs. 4–6.

Courts have routinely considered an employee's regular attendance and timeliness to be an essential function of employment. *Matzo v. Postmaster General*, 685 F. Supp. 260, 263 (D.D.C. 1987), *aff'd without opinion*, 861 F.2d 1290 (D.C. Cir. 1988) (regular attendance is an "essential function"); *Carr v. Reno*, 23 F.3d 525, 529 (D.C. Cir. 1994) (the plaintiff, even with

---

[4] The Court assumes, but does not decide, that Mr. Pressley has a disability under the ADA.

accommodations, could not perform the "essential function" of coming to work regularly);
*Buckles v. First Data Res., Inc.*, 176 F.3d 1098, 1100–01 (8th Cir. 1999) ("In the context of the
ADA, we have recognized that regular and reliable attendance is a necessary element of most
jobs.") (citation modified)); *Tyndall v. Nat'l Educ. Centers, Inc. of California*, 31 F.3d 209, 213
(4th Cir. 1994) (same); *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir. 1996)
(same); *Kotlowski v. Eastman Kodak Co.*, 922 F. Supp. 790, 798 (W.D.N.Y. 1996) ("The ADA
does not require an employer to accommodate an employee who cannot get to work. [Plaintiff's]
inability to get to work on time, if at all, made her unqualified to perform the functions of her
job."); *Berkey v. Henderson*, 120 F. Supp. 2d 1189, 1191–93 (S.D. Iowa 2000) ("[A]s a matter of
law[,] because of Berkey's excessive tardiness he is unqualified to perform the essential function
of regular and reliable attendance."); *Palazzolo v. Galen Hosps. of Texas, Inc.*, No.
CIV.A.1:96CV2550TWT, 1997 WL 837951, at *3 (N.D. Ga. Nov. 25, 1997) ("Many
courts . . . have held as a matter of law that excessive, sporadic and unpredictable absenteeism or
tardiness renders the employee an unqualified individual under the ADA or the Rehabilitation
Act.") (collecting cases)).

    The evidence also shows that Mr. Pressley's employment required his reliable, on-site
presence during established core hours. Thus, an even later start time would not have allowed
Mr. Pressley to fulfill his responsibilities. *See Doak v. Johnson*, 798 F.3d 1096, 1106 (2015) (a
later start time would not have enabled employee to perform her job duties on a regular basis due
to the customer service expectations, which required her on-site presence to fulfill). Mr.
Pressley's responsibilities as a Material Coordinator for IT Asset Management for the FTC
contract—namely, ordering equipment, deploying it, apportioning it to staff, and managing its
movement between different offices—required Mr. Pressley to be physically present at the

FTC's headquarters. Def.'s Opp'n, Ex 10; Def.'s MSJ, Ex. 1 at 31:12–22. Mr. Pressley had to leave the FTC premises at the end of his shift, and his work equipment had to remain on-site. Def.'s MSJ Exs. 14 at 2–3. Because the FTC is MSTI's customer, Mr. Pressley's role required performing certain "contract requirements," including daily tasks and reporting requirements. Def.'s Opp'n, Ex. 3 at 1, Ex. 14. Under the contract, for instance, asset-management personnel, like Mr. Pressley, need to be available to support the FTC's daily operations and respond to the agency's changing needs, which can be unpredictable. *Id*. Ex 3 at 1. As a result, MSTI staffs its teams to ensure continuous coverage. *Id*. And Mr. Pressley's failure to arrive on time "had a negative impact on [MSTI] providing quality services to [MSTI's] FTC customer." *Id*. Ex. 5 at 2; Def.'s Stmt. ¶ 16; *see also Doak*, 798 F.3d at 1106 (employee's on-time and on-site presence was required; her unpredictable absences and tardiness negatively affected the agency employer's ability to accomplish its mission). Indeed, Mr. Pressley does not dispute that his role required him to be on site during certain hours—that is, on time and physically present at FTC's headquarters.

And where a plaintiff "even with accommodations, [cannot] perform the 'essential function' of coming to work regularly," the plaintiff is not a "qualified individual" within the meaning of the ADA. *Tobey v. U.S. Gen. Servs. Admin.*, 480 F. Supp. 3d 155, 166 (D.D.C. 2020) (citing *Carr*, 23 F.3d at 529); *see also Doak*, 798 F.3d at 1105–07. Because the undisputed evidence here shows that Mr. Pressley repeatedly arrived tardy to work—despite MSTI adjusting his schedule to accommodate a later start time—he was unable to perform an essential function of his employment and was therefore not a "qualified individual" under the ADA. Nor has Pressley proffered evidence disputing that his job required him to be present on-site during core hours and that a later start time would have enabled him to fulfill that function. *See Doak*, 798

F.3d at 1105–07 (holding that employee was unable to perform an essential job function as she failed to proffer evidence disputing that her job required her to be present for interactive meetings during business hours and that a later start time would have allowed her to perform that function). Mr. Pressley's claims thus fail, warranting summary judgment in MSTI's favor. *See Teneyck v. Omni Shoreham Hotel*, 224 F. Supp. 2d 43, 47 (D.D.C. 2002) ("Summary judgment is appropriate in an employment discrimination case where . . . the evidence is insufficient to establish a prima facie case.").

### B. ADA and DCHRA Retaliation Claims: Suspensions and Denial of Professional Development Opportunity

Mr. Pressley contends that MSTI retaliated against him for requesting accommodations by suspending him without pay and denying him a professional development opportunity, in violation of the ADA and DCHRA. Pl.'s MSJ at 30. MSTI maintains that it declined Mr. Pressley's request to attend a professional development event because of his performance issues—namely, "documented attendance problems"—which it addressed "through progressive discipline" in the form of warnings and suspensions. Def.'s Opp'n at 6–7; Def.'s Stmt. ¶¶ 15–20. Mr. Pressley, however, offers no evidence that MSTI's non-retaliatory reasons for the discipline, including the denial of a professional development opportunity, were in truth motivated by his request for accommodations. *See id.*

ADA and DCHRA retaliation claims are analyzed under the *McDonnell Douglas* three-step framework. *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005); *Ranowsky v. Nat'l Railroad Passenger Corp.*, 244 F. Supp. 3d 138, 143 (D.D.C. 2017); *see also Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1246 (D.C. Cir. 2011). Under this framework, the plaintiff must establish the three elements of a prima facie case of retaliation: (a) that he engaged

in protected activity; (b) that his employer subjected him to an adverse employment action; and (c) that there is a causal link between the adverse employment action and the protected activity. *Smith*, 430 F.3d at 455; *DuBerry v. D.C.*, 582 F. Supp. 2d 27, 37 (D.D.C. 2008). Such a showing raises a rebuttable presumption of unlawful discrimination and shifts to the defendant the burden to rebut the presumption by asserting a legitimate, non-retaliatory reason for its actions. *Smith*, 430 F.3d at 455.

If an "employer offers a . . . non-retaliatory reason for the challenged action, the burden-shifting framework disappears and the court's inquiry narrows . . . . [T]he only relevant inquiry is whether the employee has put forth sufficient evidence for a reasonable jury to conclude that the employer's proffered explanation is a mere pretext and the employer intentionally . . . retaliated against the employee." *Ranowsky*, 244 F.Supp.3d at 143–44; *see also Vatel*, 627 F.3d at 1246. Courts consider this question in light of all the evidence, asking whether the jury could infer retaliation from the combination of: (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of retaliation that may be available to the plaintiff or any contrary evidence that may be available to the employer. *See Jones v. Bernanke*, 557 F.3d 670, 677–79 (D.C. Cir. 2009); *see also Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012).

Here, the evidence shows that the MSTI's disciplinary actions against Mr. Pressley, including the denial of a professional development opportunity, were the result of Mr. Pressley's failure to perform an essential aspect of his job (i.e., arriving to work in a timely fashion), not because he requested accommodations. *See* Pl.'s MSJ, Ex. 3 (March 2019 performance evaluation noting that "[it] would like to see [Mr. Pressley] improve on [his] punctuality"); *id*. Ex. 5 at 1 (suspension letter suspending Mr. Pressley without pay for two days because of his

continued failure to report to work on time, noting that Mr. Pressley arrived tardy to work at least

six times between May 2019 and July 2019); *id*. Ex. 6 at 1 (suspension letter suspending Mr.

Pressley without pay for five days because of his continued failure to report to work on time,

noting that Mr. Pressley arrived tardy to work at least three times between August 2019 and

September 2019); *id*. Ex. 7 (email by MSTI declining Mr. Pressley's request to attend a

professional development event "based on [Mr. Pressley's] standing with MSTI."). Mr. Pressley

acknowledges that "the record is replete with disciplinary notices citing Mr. Pressley for

tardiness and performance deficiencies." Pl.'s Reply at 7. At best, Mr. Pressley offers weak

evidence of temporal proximity. Mr. Pressley contends that near the time these suspensions

occurred, MSTI was in direct contact with his healthcare provider regarding his accommodation

request and was aware of the medical reason behind the request, which, according to Mr.

Pressley, supports an inference of retaliatory animus. Pl.'s MSJ at 30.

To be sure, "a plaintiff can establish the causation element of the prima facie case by

showing a tight temporal proximity between protected activity and an adverse employment

action," "where the two events are very close in time." *Iyoha v. Architect of the Capitol*, 927

F.3d 561, 574 (D.C. Cir. 2019) (citation modified). However, "[o]nce the employer proffers a

non-retaliatory explanation for the adverse employment action," a court "must determine

whether [the employee] has put forward enough evidence to defeat the proffer and support a

finding of retaliation." *Id*.  "Mere temporal proximity is not sufficient to support such a finding,

because otherwise protected activities would effectively grant employees a period of immunity,

during which no act, however egregious, would support summary judgment for the employer in a

subsequent retaliation claim." *Id*. As a result, "positive evidence beyond mere proximity is

required to defeat the presumption that the proffered explanations [for the adverse employment

action] are genuine." *Id*. But Mr. Pressley has not introduced anything beyond this weak evidence of temporal proximity to show that the MSTI's decision to suspend him was motivated by a desire to retaliate against him for requesting accommodations.

Rather, it appears that Mr. Pressley's true objection is simply his disagreement with MSTI's decision to discipline him for tardiness he attributes to his disability. "While the court accepts that Plaintiff's tardiness . . . was 'directly related' to his medical condition," the ADA "neither excuses an employee with a disability from performing the essential functions of his job nor does it shield him from workplace discipline when his job performance falls short." *Tobey*, 480 F. Supp. 3d at 166. Mr. Pressley further contends that "his tardiness and performance deficiencies . . . would have been directly addressed or rendered moot had his accommodations actually been honored." Pl.'s Reply at 7. But, as explained above, the evidence indicates that even if his accommodations had been implemented before MSTI imposed discipline, Mr. Pressley would still have been unable to arrive on time. In other words, accommodations would not have remedied his tardiness and performance deficiencies.

Mr. Pressley has thus failed to put forth sufficient evidence for a reasonable jury to conclude that MSTI's proffered explanation is a mere pretext and MSTI intentionally retaliated against Mr. Pressley for requesting accommodations. *See Vasilevsky v. Reno*, 31 F. Supp. 2d 143, 147 (D.D.C. 1998) ("[T]he plaintiff must . . . show by a preponderance of the evidence that defendant's non-discriminatory reasons . . . were not the true reasons, but rather a pretext for discrimination."). Therefore, summary judgment in MSTI's favor is appropriate.

### C. ADA, FMLA, and DCFMLA Retaliation Claims: Termination

Mr. Pressley next claims that MSTI terminated him because he requested accommodations under the ADA and intermittent leave under the FMLA, in violation of the

ADA, FMLA, and DCFMLA. Pl.'s MSJ at 29–30. Mr. Pressley observes that his termination came only 21 days after MSTI approved his intermittent FMLA request. *See, e.g.*, Pl.'s MSJ at 19.

Like claims of retaliation under the ADA, *see supra* pp. 15–16, courts evaluating claims of retaliation under the FMLA and DCFMLA also apply the *McDonnell Douglas* burden-shifting framework. Under that framework, as noted above, "[o]nce the employer proffers a non-retaliatory explanation for the adverse employment action," a court "must determine whether [the employee] has put forward enough evidence to defeat the proffer and support a finding of retaliation." *Iyoha*, 927 F.3d at 574. At the summary judgment stage, temporal proximity alone is insufficient to defeat the proffer. *Id*.

Here, MSTI contends that it terminated Mr. Pressley because he violated FTC security protocols. Def.'s Opp'n at 10–11. In response, Mr. Pressley asserts that MSTI's justification is pretextual because: (1) MSTI's reason for terminating him is uncorroborated; (2) another MSTI employee, despite having also committed a security violation, was not terminated; and (3) MSTI has offered shifting rationales for his termination. None of Mr. Pressley's assertions, however, are reasonably supported by the record.

### 1.  Mr. Pressley's Security Violations

First, Mr. Pressley contends that MSTI's explanation for his termination—that he violated security policy—is "undefined, undocumented, and uncorroborated." Pl.'s Reply at 15 ("MSTI has not produced a single internal memorandum, email, policy directive, or witness declaration demonstrating that Mr. Pressley violated any articulated rule."). To the contrary, the record—including evidence Mr. Pressley submitted in support of his motion—corroborates MSTI's asserted rationale.

Contemporaneous communications between the FTC and MSTI show that Mr. Pressley violated FTC security policy. On December 13, 2019, FTC personnel discovered that Mr. Pressley had been entering and exiting the FTC headquarters after his core hours of 10:00 a.m. to 5:30 p.m., observing that "there are several departures and entries beyond 7:00 [p.m.] with the latest time being after 10 [p.m.] at night." Pl.'s MSJ, Ex. 17 at 2. Indeed, FTC security logs indicated that from at least October 1, 2019 to December 11, 2019, Mr. Pressley rarely left the FTC premises shortly after 5:30 p.m., when his shift ended. *See* Def.'s MSJ, Exs. 12, 14 at 8–10. After making this discovery, FTC personnel alerted MSTI that it was "very disturbed" by Mr. Pressley's "inconsistent entry and exiting [from] the FTC HQ building." *Id*. Ex. 13 at 3. The FTC explained to MSTI that "Mr. Pressley works in an accountable area and such behavior does not match the suitable performance that trusted personnel should conduct." *Id*.

Shortly thereafter, the FTC met with MSTI to discuss its "concerns regarding the need for [Mr. Pressley's] onsite presence without supervision or approval," because of Mr. Pressley's assigned area of responsibility. *Id*. at 1. And according to MSTI, it was "not aware of the need for nor [had it] authorized these off hour occurrences." *Id*. The FTC subsequently discovered that "Mr. Pressley's laptop and cellular device were not located onsite." *Id*. The FTC informed MSTI that Mr. Pressley had until 12:00 p.m. that day to return all assets to FTC's headquarters, otherwise, Federal Protective Services would retrieve the assets. *Id*; *see also* Pl's MSJ, Ex. 25. The FTC deactivated all of Mr. Pressley's accounts that same morning. Def.'s MSJ, Ex. 13. By approximately 1:30 p.m., MSTI terminated Mr. Pressley, citing his violation of "Federal Trade Commission security regulations and protocols for contract employees." Pl.'s MSJ, Exs. 15, 16.

Mr. Pressley's termination is further supported by MSTI's Policies Handbook, which Mr. Pressley attested to reading and understanding. Def.'s MSJ, Ex. 3. The Handbook prohibited Mr.

Pressley from removing customer property from the customer's premises without supervisor authorization and required him to "leave the customer's premise after [he] complete[d] [his] work hours" and "not loiter at the customer's site." *Id.* Exs. 3, 14 at 2–3. Indeed, when Mr. Pressley was asked specifically whether he needed to leave the customer's premise by 5:30 p.m., he responded, "Yes[,] [i]t's part of the handbook." Def.'s Opp'n, Ex. 4 at 72:3–6. Nor does Mr. Pressley dispute that he did, in fact, remove property from the FTC premises.

Mr. Pressley's termination is also consistent with the governing contract between the FTC and MSTI. According to that contract, the FTC can deny and/or restrict access to government facilities, access to controlled unclassified information, and/or access to IT resources for any contract employee, like Mr. Pressley, who the FTC determines to present a risk of compromising confidential unclassified information. *Id.* Ex. 9. The FTC made this finding and revoked Mr. Pressley's access.

Despite this corroborating evidence, Mr. Pressley makes much of the fact that MSTI does not point to a particular provision contained in the FTC's own policies to justify Mr. Pressley's termination. But this is a red herring. Even if MSTI cannot now point to any FTC policy and regardless of whether Mr. Pressley actually violated any such policy, so long as MSTI reasonably believed that such a policy existed or that Mr. Pressley had committed such violations, "there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts" forming the basis for the employment decision. *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008) (where the employer reasonably believed an employee had violated its sexual harassment policy, the relevant question in a pretext analysis is not whether the misconduct actually occurred, but whether the employer honestly and reasonably believed it did); *George v. Leavitt,* 407 F.3d 405, 415 (D.C. Cir. 2005) ( "[A]n

employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false."); *Fischbach v. D.C. Dep't of Corr.,* 86 F.3d 1180, 1183 (D.C. Cir. 1996) (employer prevails if it "honestly believes in the reasons it offers"); 1 Larson § 8.04, at 8-73 ("[A]n employer's action may be based on a good faith belief, even though the reason may turn out in retrospect to be mistaken or false.").

And MSTI's belief that Mr. Pressley violated FTC security policy is reasonable considering the FTC's contemporaneous communications regarding Mr. Pressley's unauthorized after-hours access, his removal of FTC equipment from the FTC premises, and the FTC's subsequent revocation of his security privileges, as discussed above. *See Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012) ("[T]he absence of any contemporaneous documentation supporting [an employer's] explanation could lead a reasonable jury to disbelieve the [employer] and to reach a verdict in [the plaintiff's] favor."). Mr. Pressley has not raised any legal claim that the FTC had any reason to harbor discriminatory or retaliatory animus towards him. Therefore, contrary to Mr. Pressley's assertions, the record sufficiently corroborates MSTI's belief that Mr. Pressley violated FTC security protocols and, in turn, MSTI's non-retaliatory justification for his termination.

## 2.  Comparator Evidence

Second, Mr. Pressley attempts to invoke comparator evidence to undercut MSTI's explanation. Pl.'s MSJ at 23–24. To show that an employer's stated reason for its employment action was a pretext, an employee may produce evidence suggesting that the employer treated other employees who did not engage in protected activities more favorably in the same factual circumstances. *See Brady*, 520 F.3d at 495. Mr. Pressley's evidence, however, is insufficient to establish that a similarly situated MSTI employee received more favorable treatment. *See, e.g*.,

*Walker v. McCarthy*, 170 F. Supp. 3d 94, 108 (D.D.C. 2016) ("[W]here a plaintiff relying on comparator evidence fails to produce evidence that the comparators were actually similarly situated to him . . . summary judgment is appropriate."); *Beachner v. Howard Univ*., No. CV 23-494 (TJK), 2025 WL 915573, at *7 (D.D.C. Mar. 25, 2025)

"To prove that he is similarly situated to another employee, a plaintiff 'must demonstrate that [he] and the allegedly similarly situated . . . employee were charged with offenses of comparable seriousness." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (quoting *Holbrook v. Reno,* 196 F.3d 255, 261 (D.C. Cir. 1999)). "A plaintiff must also demonstrate that 'all of the relevant aspects of [his] employment situation were nearly identical to those of the [other]' employee." *Id*. (quoting *Holbrook,* 196 F.3d at 261). "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Id*. (citing *Coleman,* 667 F.3d at 847).

According to Mr. Pressley, another MSTI employee, Alex Barnwell, violated federal security protocols by entering FTC facilities without authorization, "the very type of unauthorized access that [the] FTC later raised concerns about" as to Mr. Pressley. Pl.'s MSJ at 24. Mr. Pressley further contends that MST did not discipline or terminate Mr. Barnwell, despite him committing similar security violations. *Id*. But Mr. Pressley overlooks that Mr. Barnwell, when the violations occurred, was not an MSTI employee nor did Mr. Barnwell report to the same MSTI supervisor as Mr. Pressley when he himself violated security policy. Rather, Mr. Barnwell was a contracted consultant for MSTI who reported to MSTI's then-Project Manager Leslie Alexander. *Id*. Ex. 19 at 1–2. Mr. Pressley, on the other hand, reported to Project Manager

Veronica Matthews when MSTI terminated him. Pl.'s Stmt. ¶ 8; Pl.'s MSJ, Ex. 4 at 3. Moreover, Mr. Barnwell's fate is unclear. Mr. Pressley offers no evidence regarding MSTI's discipline of Mr. Barwell or the lack thereof.

Regardless, the security violations committed by Mr. Barnwell and Mr. Pressley were dissimilar. Mr. Barnwell's security violation *also implicated* MSTI Project Manager Mr. Alexander: Mr. Alexander "[allowed] Mr. Barnwell access to the . . . space without authorized MSTI or FTC personnel present" and asked FTC staff "to log-in to the FTC reporting program to allow Mr. Barnwell to work." Pl.'s MSJ, Ex. 20 at 1. On the other hand, no MSTI personnel allowed Mr. Pressley unsupervised access to FTC facilities after his shift ended. *See* Def.'s MSJ, Exs. 12, 14. And unlike Mr. Pressley, Mr. Barnwell never removed FTC assets from the FTC premises. Def.'s Opp'n, Ex. 19, Decl. of Norris C. Middleton ¶¶ 4–6. Therefore, Mr. Pressley has failed to produce evidence indicating that Mr. Barnwell was similarly situated to him. *See Gulley*, 474 F. Supp. 3d at 167 ("[T]he lack of evidence of similarity is itself reason to grant summary judgment.").

### 3. Shifting Rationales for Mr. Pressley's Termination

Finally, Mr. Pressley claims that MSTI's rationale for terminating Mr. Pressley has continuously shifted, first citing "performance issues," then "untrustworthiness," and finally, violations of security protocols. *See, e.g.*, Pl.'s MSJ at 22, 25–28. Certainly, "evidence that an employer has offered shifting rationales . . . is generally sufficient to create an issue of fact for the jury." *Casselle v. Chao*, 270 F. Supp. 3d 314, 326 (D.D.C. 2017) (quoting *Clendenny v. The Architect of the Capitol*, 236 F. Supp. 3d 11, 25 (D.D.C. 2017)). But Mr. Pressley offers no such evidence.

To support his shifting-rationale argument, Mr. Pressley cites an email chain from December 11, 2019 in which the FTC complains to MSTI that on numerous occasions, "Mr. Pressley appears to be actively complicating issues and preventing the efficient assignment and completion of tasks," urging MSTI to "address this issue in a timely manner." Def.'s Opp'n, Ex. 7. As a result of the FTC's complaints, MSTI that same day contemplated terminating Mr. Pressley for poor performance per the at-will clause in Mr. Pressley's employment agreement. *See id*. Mr. Pressley, however, offers no evidence suggesting that MSTI terminated him on that basis or ever relied on poor performance as the reason for his termination.

Mr. Pressley also cites a declaration by MSTI's Human Resources Vice President, Mr. James Jordan, for the proposition that, at one point, MSTI claimed to have terminated Mr. Pressley because "he was untrustworthy." *See* Pl.'s MSJ at 23. But this misrepresents the declaration's content. When faced with a question that insinuated that MSTI terminated Mr. Pressley because he was untrustworthy, Mr. Jordan's declaration clarified that: "The direct reason for Mr. Pressley's termination is stated in his termination letter. That is[,] he violated Federal Trade Commission security regulations and protocols." *Id*. Ex. 23 at 1–2. In that same declaration, Mr. Jordan also noted that "MSTI made the decision to terminate Mr. Pressley based on [the FTC's] security report." *Id*. at 1. Aside from this declaration, Mr. Pressley offers no other evidence to support the contention that Mr. Pressley's trustworthiness was a reason given for his termination.

Overall, the record does not reflect any instance in which MSTI has ever averred that it terminated Mr. Pressley for "performance issues" or his "untrustworth[iness]," as Mr. Pressley contends. Rather, MSTI has consistently maintained that it terminated him for violating security

protocols. *See, e.g.*, *id*. Ex. 4 at 10–11. And as explained above, the evidence supports MSTI's rationale.

* * *

In sum, Mr. Pressley has failed to show that MSTI's non-retaliatory reason for terminating Mr. Pressley is a pretext for retaliation. *See Diggs v. Potter*, 700 F. Supp. 2d 20, 50 (D.D.C. 2010). Mr. Pressley's assertions to the contrary amount to mere disagreement with MSTI's termination decision, which is insufficient to rebut MSTI's non-retaliatory reason. *Id*. ("[T]his Court does not sit as a 'super-personnel department that [re]examines an entity's business decisions,' even in termination cases.") (quoting *Kelly v. Mills*, 677 F. Supp. 2d 206, 229 (D.D.C. 2010)). In other words, "no reasonable jury could conclude from all the evidence" that MSTI's decision to terminate Mr. Pressley was made for a retaliatory reason. *Holcomb v. Powell*, 433 F.3d 889, 896–897 (2006 D.C. Cir.); *Liberty Lobby*, 477 U.S. at 257 ("[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment."). Summary judgment in MSTI's favor is therefore warranted.

### D.  FMLA and DCFMLA Interference Claims

Mr. Pressley contends that MSTI interfered with the exercise of his rights under the FMLA and DCFMLA. Pl.'s MSJ at 33. The FMLA provides a cause of action for an employer's interference with its employees' attempts to exercise any rights granted under the FMLA. *See* 29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."). To prevail on an FMLA interference claim, Mr. Pressley must "show both that [his] employer 'interfered with, restrained, or denied the exercise of or the attempt to exercise, any right provided' by the FMLA, and that [he] was prejudiced thereby." *McFadden v. Ballard Spahr Andrews & Ingersoll,*

26

*LLP*, 611 F.3d 1, 7 (D.C. Cir. 2010) (citation modified) (quoting 29 U.S.C. § 2615(a)(1)); *see also Ragsdale v. Wolverine World Wide, Inc*., 535 U.S. 81, 87 (2002)). Specifically, Mr. Pressley asserts that MSTI delayed for over a month before approving his intermittent FMLA leave by insisting on "unnecessary and burdensome procedures," such as "direct physician interviews," and "pressuring" Mr. Pressley to substitute Paid Time Off (PTO) for protected leave, even after MSTI approved his FMLA leave. Pl.'s MSJ at 33 (citing Exs. 9, 10).

These arguments are a nonstarter. First, under the FMLA, an employer may require an employee to substitute paid leave for any part of the 12–week FMLA entitlement. 29 U.S.C. § 2612(d)(2)(A). Thus, paid leave may "run concurrently with the unpaid FMLA leave." 29 C.F.R. § 825.207(a). "The logical purpose underlying the substitution language in the FMLA and accompanying regulations is to protect employers who offer paid sick leave benefits to their employees from having to provide both the statutory 12 weeks of leave required by the FMLA and the paid leave benefit separately." *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1205–06 (11th Cir. 2001). Absent other evidence, the fact that MSTI may have required Mr. Pressley to substitute unpaid leave with PTO does not constitute interference.[5]

Second, Mr. Pressley mischaracterizes the relevant facts. What Mr. Pressley characterizes as MSTI's "insistence" on a "direct physician interview" is an email from MSTI responding to a message initiated by Mr. Pressley's healthcare provider. In that message, the provider stated that,

---

[5] To support his assertion that MSTI "pressured" him to substitute unpaid leave with PTO, Mr. Pressley cites to his deposition, but Mr. Pressley has not provided a copy of this portion of the deposition for the Court's consideration. *See* Pl.'s MSJ at 33. Thus, it is unclear what Mr. Pressley means when he states that MSTI "pressured" him. In any event, an employer can require its employees to substitute unpaid leave for paid leave, as discussed above.

per Mr. Pressley's request, it would be sending MSTI a letter attesting to his need for

accommodations:

> I am writing on behalf of Mr. Columbus Pressley . . . . Mr. Pressley has requested
> that we write a letter to you (his employer) explaining [his disability-related
> conditions] signed by the Dr. . . . [Mr. Pressley's Doctor] is not in our facility
> everyday of the week . . . I will discuss the issue with the Dr. on Monday evening
> and draft a letter for [the Doctor] to sign. I can also scan the letter to your email
> on Monday night so it will be there for you first thing Tuesday Morning . . . . If
> you have any questions please feel free to contact me via email or phone.

Pl.'s MSJ, Ex. 10; *see also id.* Ex. 9. The healthcare provider copied Mr. Pressley on that email.

*Id*. Ex. 10. With Mr. Pressley still copied, MSTI replied, stating that: "If Mr. Pressley is

requesting ADA Reasonable Accommodation, he should submit the attached form with a

statement from your office attesting to this need." *Id*. Ex. 9.

In short, the record does not reflect that MSTI insisted on a "direct physician interview,"

as Mr. Pressley contends. *See* Pl.'s Stmt. ¶ 11 ("Mr. Jordan insisted on speaking directly with

provider Dr. Villier."). And perhaps more importantly, this correspondence occurred *months

before* Mr. Pressley ever requested FMLA leave. *See* Pl.'s MSJ, Exs. 8–10. So, such

correspondence could not have "delayed" MSTI from "approving [Mr. Pressley's] intermittent

FMLA leave," as Mr. Pressley asserts. Pl.'s MSJ at 33. Aside from this correspondence, Mr.

Pressley offers no other evidence of any purportedly unnecessary and burdensome procedures

MSTI employed to delay approving Mr. Pressley's FMLA request. *See* Pl.'s Reply at 12–13.

Summary judgment in MSTI's favor is thus appropriate. *See Liberty Lobby*, 477 U.S. at 257

("[T]he plaintiff, to survive the defendant's motion, [must] present evidence from which a jury

might return a verdict in his favor.").

## V.  CONCLUSION

For the foregoing reasons, Plaintiff's Partial Motion for Summary Judgment (ECF No.

53) is **DENIED**; Defendant's Cross-Motion for Summary Judgment (ECF No. 58) is

**GRANTED**; Defendant's Motion for Leave to File under Seal Exhibits in Opposition to Plaintiff's Motion for Summary Judgment (ECF No. 55) is **GRANTED**; and Defendant's Motion for Leave to File under Seal Exhibits in Support of Defendant's Cross-Motion for Summary Judgment (ECF No. 57) is **GRANTED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  February 18, 2026                                                    RUDOLPH CONTRERAS
                                                                                             United States District Judge